IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
June 29, 2016 Session

## STATE OF TENNESSEE v. JAYME CONKIN

**Appeal from the Criminal Court for Sullivan County**
**No. S62723     James F. Goodwin, Jr., Judge**

---

**No. E2015-01286-CCA-R3-CD – Filed September 7, 2016**

---

A Sullivan County Criminal Court jury convicted the Defendant-Appellant, Jayme Conkin, of first offense driving under the influence (DUI), a Class A misdemeanor, and she received a sentence of eleven months and twenty nine days, suspended to supervised probation after forty-eight hours' incarceration in the Sullivan County jail. On appeal, Conkin contends that (1) the evidence is insufficient to support her conviction; (2) the trial court erred in denying her motion in limine; (3) the Tennessee DUI statute is unconstitutionally vague; and (4) the State failed to disclose exculpatory evidence, requiring a new trial. Upon review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and D. KELLY THOMAS, JR., JJ., joined.

Ricky A.W. Curtis, Blountville, Tennessee, for the Defendant-Appellant, Jayme Conkin.

Herbert H. Slatery III, Attorney General and Reporter; Clark B. Thornton, Senior Counsel; Barry P. Staubus, District Attorney General; and Ben Rowe, Assistant District Attorney General, for the Appellee, State of Tennessee.

### OPINION

On November 19, 2013, a Sullivan County Grand Jury indicted Conkin for one count of DUI. Prior to trial, she filed a motion to suppress evidence taken from an allegedly unlawful seizure. A hearing on the motion was held on June 6, 2014, and the following proof was adduced.

# FACTS

**Suppression Hearing.** At the suppression hearing, Officer Craig Dunworth of the Kingsport Police Department testified that he received a call on January 29, 2013, from employees of the Americas Best Value Inn, located in Kingsport, Tennessee, concerning two individuals that were either passed out or had fallen asleep in their vehicle. He arrived at the motel at 10:04 a.m. and observed two individuals, later identified as Conkin and her fiancé Ryan Anglen, asleep in a Chevrolet sedan. Officer Dunworth specifically recalled that the vehicle appeared to be running and that both the brake and back-up lights were illuminated. Because he believed the vehicle was in gear, he parked several feet back and did not activate his blue lights.

Officer Dunworth also noticed that the driver's side window was down, which he thought was odd given that it was January and cold outside. Once backup arrived, Officer Dunworth approached the vehicle and attempted to rouse Conkin, who was sitting in the driver's seat. Initially, Conkin did not respond to his verbal commands. Officer Dunworth could not recall specifically if he was able to wake her by shaking her arm through the open window, "but at any rate [he] was able to eventually arouse her."

Once she was awake, Officer Dunworth noted that she exhibited signs of intoxication. Specifically, he recalled that her speech was slurred and that she appeared generally lethargic. Officer Dunworth testified that her lethargy did not improve as he continued to speak with her as he would have expected when dealing with someone who had just awoken from a deep sleep. After admitting that she had taken some medication the night before, Officer Dunworth administered field sobriety tests, and Conkin "performed poorly." He then placed her under arrest on suspicion of DUI.

On cross-examination, Officer Dunworth confirmed that he was initially called to investigate two people asleep in their vehicle and that there were no accusations of drugs, alcohol, or reckless driving. He also confirmed that Conkin informed him that she and Anglen had been staying in the motel room they were parked in front of for several weeks. Officer Dunworth agreed that the distance from the vehicle to the front door of the motel room was approximately four feet and that he did not observe any illegal items in the vehicle. He also could not recall finding a key on Conkin, nor did he remember if he ordered Conkin to step out of the vehicle or if she got out on her own.

At the conclusion of the hearing, the trial court orally denied the motion and explained its ruling as follows:

> [W]e have a vehicle that's on and we have the vehicle in reverse. That's what the testimony has been, the vehicle is in reverse and the brake lights

are on and [] apparently behind the [wheel] is somebody that's either asleep or passed out so [Officer Dunworth] certainly has, I think, every right to double check and see what's going on and, again, I've not heard anything to indicate in the testimony today that [Officer Dunworth] did anything other than go up and have a consensual encounter with a person in a public parking lot. He didn't open the door. There was no reason to [open] the door because the window is down . . . So I find that it was a consensual encounter and based upon his consensual contact with the person, now whether he in my opinion touched her on the arm or not I think he would have the right to touch her on the arm just to make sure that the vehicle became safe. There's no testimony one way or the other on that. And then after she was aroused [and] having the conversation with her [Officer Dunworth] made the determination that he needed to further investigate whether she was under the influence, got her out, [performed] field sobriety tests, [and] arrested her. So I don't find that she was unlawfully seized in the way he parked or the way he went up and had his contact with her there at the scene before he was able to make the determination that she may be impaired and have to do further investigation. So I'm going to deny your motion with regard to that.

The case then proceeded to trial, which began on December 2, 2014.

**Trial.** At trial, Officer Christopher Jones of the Kingsport Police Department testified that he arrived at the motel about a minute after Officer Dunworth, and observed two individuals asleep or passed out in a running Chevrolet sedan. He testified that Officer Dunworth was able to wake Conkin, who was sitting in the driver's seat, and that her eyes appeared glossy, her speech was slurred, and that she appeared generally lethargic. On cross-examination, Officer Jones conceded that he could not recall how he positioned his police cruiser when he parked at the scene, nor did he recall where Officer Dunworth's cruiser was parked in relation to Conkin's vehicle. He also agreed that he never saw Conkin drive the vehicle and that she told him that she and Anglen were staying in the motel room immediately in front of the vehicle.

Officer Dunworth repeated at trial that, when he arrived on the scene, Conkin's vehicle was running, the brake lights were illuminated, and that the driver's side window was at least partially down because he recalled shaking Conkin's shoulder through the open window to wake her up. After multiple attempts, she responded and he observed that her speech was slurred and that she appeared "very lethargic." Conkin proceeded to explain that she and Anglen had been up most of the night calling to try and find a missing friend. After Conkin failed multiple field sobriety tests, he placed her under arrest. Conkin agreed to a blood test and Officer Dunworth forwarded the blood sample

to the Tennessee Bureau of Investigation (TBI) for analysis. On cross-examination, Officer Dunworth conceded that he never saw Conkin drive the vehicle, and did not know how long she and Anglen had been asleep in the vehicle prior to his arrival. Further, he could not recall whether he found Conkin's keys inside the vehicle at the time of her arrest, in a subsequent search of the vehicle, or in a later consensual search of Conkin's motel room.

TBI Agent Stephanie Dotson testified as an expert in forensic toxicology. She stated that she analyzed Conkin's blood sample and memorialized the results in a report, which was introduced into evidence at trial. As reflected in the report, Conkin's blood tested positive for several central nervous system depressants, including Alprazolam (Xanax), Oxycodone (Oxycontin), Diazepam (Valium), Tramadol (Ultram), and Diphenhydramine (Benadryl). Agent Dotson testified that each of these drugs can impair a person's ability to safely operate a vehicle. However, on cross-examination, she conceded that the level for three of the drugs, Valium, Tramadol, and Benadryl in Conkin's system was so low that the test was unable to quantify the specific amount. She also conceded that the degree of impairment caused by these drugs depends on a number of factors, including the amount of the drug in a person's system and that person's degree of tolerance.

Ryan Anglen, Conkin's fiancé, testified that he and Conkin had been living at the motel for "[a] couple of weeks" at the time of Conkin's arrest, and that Conkin had rented a 2012 Chevrolet Cruze for "a couple weeks; maybe towards a month," while her vehicle was being repaired. On the night of the offense, Conkin had been trying to get in touch with a missing friend for several hours between 1:00 and 4:00 a.m. The reception was poor in their motel room so they went to the vehicle to make and receive phone calls. Anglen testified that they were waiting on a call when they both fell asleep sometime around 5:00 a.m. He claimed that neither he nor Conkin drove the vehicle that night and that the last time it had been moved was the day before. He additionally claimed that Officer Dunworth parked directly behind their vehicle when he arrived and that there was not enough room for the vehicle to pull out.

Additionally, Anglen explained that the vehicle was equipped with a "push-button start" ignition that required a key fob to be in or near the vehicle for it to start. He testified that after unlocking the vehicle and turning it on, Conkin put the key fob back in the motel room. On cross-examination, Anglen admitted that he had taken two narcotic pain relievers that night and was arrested for, and later convicted of, public intoxication.

Testifying on her own behalf, Conkin confirmed that Anglen had given an accurate explanation for how the two of them came to stay at the motel. In regard to their vehicle, she testified that she rented a 2012 Chevrolet Cruze for a period of 31 days and

that the vehicle was equipped with a push-button start. She denied driving the vehicle any time during the evening of January 28 or the early morning of January 29, 2013. She confirmed that she and Anglen had only gone to the vehicle to make and receive phone calls because of the poor reception inside the motel room. In addition, she denied having the key fob on her at the time of her arrest and claimed that Officer Dunworth collected it when she consented to a search of the motel room. She also denied that the vehicle was in reverse when Officer Dunworth arrived. On cross-examination, she explained that her window was down because she had been smoking before she fell asleep.

William Moskel, a General Motors Master Technician familiar with "push-button start" ignitions, testified on behalf of the defense. He explained that the vehicle is started by pushing a button on the dash rather than using a key but that the key fob must be in the vehicle in order for it to move. He explained:

> There's an immobilizer in the vehicle and it takes a signal from the fob and allows the vehicle to do different things depending on the strength of the signal. If the keys are in the vehicle it will let it start [and] drive. If the keys aren't in the vehicle . . . It will start, but it will not drive.

Moskel also clarified that the vehicle would not shift gears without the key fob being in the vehicle, and that if someone pressed the brake pedal when the vehicle was running but the key fob was not in the vehicle, the vehicle would automatically shut down. He also noted that certain features on the vehicle, such as the windows, air conditioning, and heat would function without the presence of the key fob, but he agreed that "the only way the vehicle would move is if the fob was in the vehicle."

At the conclusion of the proof, the jury convicted Conkin as charged and imposed a $750 fine. The matter was then set for a sentencing hearing, which occurred on April 30, 2015. After the hearing, the trial court sentenced her to eleven months and twenty-nine days, suspended to probation after forty-eight hours of mandatory jail time. Conkin subsequently filed a motion for acquittal or new trial, which was denied. This timely appeal followed.

## ANALYSIS

On appeal, Conkin claims that (1) the evidence is insufficient to sustain her conviction; (2) the trial court erred in denying her motion to suppress evidence gained from an unlawful seizure; (3) the Tennessee DUI statute is unconstitutionally vague because it fails to define the term "physical control"; and (4) the State failed to disclose exculpatory evidence, requiring a new trial. Upon our review, we affirm the judgment of the trial court.

**I.    Sufficiency of the Evidence**.   Conkin challenges the sufficiency of the evidence supporting her conviction for DUI in two respects:  (1) she claims the State failed to introduce adequate proof of her impairment and, (2) she argues that the State failed to demonstrate that she had "physical control" over the vehicle at the time of the arrest.  The State responds that the evidence of intoxication and physical control are sufficient to sustain her conviction.  For the following reasons, we agree with the State.

"Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict."  State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009) (citing State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992)).  When a defendant challenges the sufficiency of the evidence, the standard of review applied by this court is "whether 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"  State v. Parker, 350 S.W.3d 883, 903 (Tenn. 2011) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)).  Similarly, Rule 13(e) of the Tennessee Rules of Appellate Procedure states, "Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the finding by the trier of fact of guilt beyond a reasonable doubt."  When this court evaluates the sufficiency of the evidence on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence.  State v. Davis, 354 S.W.3d 718, 729 (Tenn. 2011) (citing State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010)).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two.  State v. Sutton, 166 S.W.3d 686, 691 (Tenn. 2005); State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998).  The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'"  State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)).  The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence.  State v. Campbell, 245 S.W.3d 331, 335 (Tenn. 2008) (citing Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)).  Moreover, the jury determines the weight to be given to circumstantial evidence, the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence are questions primarily for the jury.  Dorantes, 331 S.W.3d at 379 (citing State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006)).  When considering the sufficiency of the evidence, this court shall not substitute its inferences for those drawn by the trier of fact.  Id.

To convict Conkin of DUI, the State was required to prove beyond a reasonable doubt that she drove or was "in physical control of any automobile or other motor driven vehicle on any of the public roads and highways of the state . . . or any other premises that is generally frequented by the public at large, while . . . [u]nder the influence of any intoxicant[.]" T.C.A. § 55-10-401(1).

Here, Conkin first contends that there was insufficient evidence to show that she was impaired at the time of her arrest. Viewed in the light most favorable to the State, the evidence reflects that Conkin was found asleep in the driver's seat of a running vehicle with both the back-up and brake lights illuminated. In addition, Officer Dunworth testified her demeanor was "very lethargic" after he woke her and that her lethargy did not improve as he continued to speak with her. He also testified that she "performed poorly" on all field sobriety tests, and Conkin admitted to having taken multiple prescription medications the night before. Although Agent Dotson was unable to quantify amounts, she testified that several of the medications in Conkin's system, including Xanax, Oxycontin, and Valium, were central nervous system depressants that could impair a person's ability to safely operate a motor vehicle. Accordingly, there was sufficient evidence of Conkin's impairment to sustain her conviction, and she is not entitled to relief.

Conkin also argues that the evidence is insufficient to show that she was in physical control of the vehicle at the time of her arrest. In support, she notes that Mr. Moskal's testimony that the vehicle would start but would not go into gear without the key fob being in the vehicle was consistent with her claim that she left the key fob in the motel room. Because her testimony on the location of the key fob was "unchallenged," she argues that there was no evidence that she could actually have driven the vehicle and, accordingly, no basis for the jury to determine that she was "in control" of the vehicle.

In determining whether a person is in physical control of a vehicle for the purposes of the DUI statute, the Tennessee Supreme Court has established a totality of the circumstances test that considers the presence or absence of several factors. Those factors include: (1) the location of the defendant in relation to the vehicle; (2) the whereabouts of the ignition key; (3) whether the motor was running; (4) the defendant's ability, but for her intoxication, to direct the use of the vehicle; and (5) the extent to which the vehicle is capable of being operated. State v. Lawrence, 849 S.W.2d 761, 765 (Tenn. 1993). Ten years later, the Tennessee Supreme Court expounded on the fifth factor and adopted the "reasonably capable of being rendered operable" standard where "the proper focus was not narrowly on the 'mechanical condition of the vehicle when it comes to rest, but upon the status of its occupant and the nature of the authority he or she exerted over the vehicle in arriving at the place from which, by virtue of its inoperability, it can no longer move.'" State v. Butler, 108 S.W.3d 845, 852 (Tenn. 2003) (quoting

State v. Smelter, 674 P.2d 690, 693 (Wash. App. 1984)). Accordingly, "where 'circumstantial evidence permits a legitimate inference that the vehicle was where it was and was performing as it was because of the defendant's choice, it follows that the defendant was in' physical control of the vehicle." Id. (quoting Smelter, 674 P.2d at 693).

Here, the evidence was sufficient for the jury to find that Conkin was in physical control of the vehicle and that it was reasonably capable of being operated at the time of her arrest. Considering the factors listed in Lawrence, Conkin was positioned in the driver's seat, the motor was running, and she had exhibited an ability to direct the use of the vehicle by unlocking it, turning the heat on, and rolling down the window. In past cases, this court has determined that a defendant had physical control over a vehicle under similar factual circumstances. See State v. Billy L. Hall, No. M2005-02862-CCA-R3-CD, 2006 WL 3498049, at *3 (Tenn. Crim. App. Nov. 26, 2006) (holding that evidence was sufficient to prove physical control where defendant was found passed out or asleep in the driver's seat of a vehicle with the motor running and the headlights on); State v. John Sterling Lewis, No. M2004-02450-CCA-R3-CD, 2006 WL 1816317, at *3 (Tenn. Crim. App. June 28, 2006), perm. app. denied (Tenn. Nov. 20, 2006) (holding that evidence was sufficient to prove physical control where the Appellant was found sitting in the driver's seat of a vehicle, with the motor running, the vehicle in gear, and the brake lights on "suggesting that the Appellant's foot was on the brake"); State v. Robert G. Laney, No.M2005-00502-CCA-R3-CD, 2005 WL 3199050, at *2 (Tenn. Crim. App. Nov. 30, 2005) (holding that evidence was sufficient to prove physical control where defendant was found intoxicated and in the driver's seat of a parked vehicle, with the keys in the ignition, and the engine running); State v. Johnny Wade Meeks, No. 03C01-9811-CR-00411, 1999 WL 1084230, at *3 (Tenn. Crim. App., at Knoxville, Dec. 3, 1999) (holding that evidence was sufficient to prove physical control where the defendant was found in driver's seat of van parked in a commercial parking lot with the engine running and headlights on).

Conkin argues that the remaining two factors regarding the location of the key fob and the operability of the vehicle, weigh in her favor and distinguishes her case from those cited above. We disagree. While there was testimony at trial that the key fob was in the motel room when Officer Dunworth arrested Conkin, this fact, even if true, is not dispositive. We note that one of the purposes of the Tennessee DUI statute is to "enable the drunken driver to be apprehended before [she] strikes." Lawrence, 849 S.W.2d at 765. Furthermore, "the legislature desired not only to prohibit the operation of a vehicle by an intoxicated individual, but also to remove from the inebriated the option of operating a vehicle." State v. Turner, 953 S.W.2d 213, 215 (Tenn. Crim. App. 1996) (emphasis added). Here, Conkin and Anglen testified consistently that the vehicle was parked directly outside the front door of their motel room. Even assuming, arguendo,

that the key fob was inside the room and that Conkin could not have driven the vehicle without getting it, the key fob was never more than a few feet away from Conkin and, as such, the vehicle was "reasonably capable of being rendered operable," within the meaning of Lawrence. Accordingly, the evidence was sufficient for the jury to find that Conkin had physical control of the vehicle, and she is not entitled to relief on this issue.

**II. Unlawful Seizure.** Next, Conkin argues that the trial court erred in denying her motion to suppress evidence gained from her unlawful seizure. Specifically, she claims that "Officer Dunworth clearly seized the Defendant by either reaching into her vehicle and shaking her by the shoulder, [and] immediately subjecting her to questioning; or by opening the door to her vehicle and asking that she get out of the vehicle; or by directing Ms. Conkin to get out of the vehicle." The State responds that the officer's actions were lawful pursuant to the community caretaker exception as defined by the Tennessee Supreme Court in State v. McCormick, – S.W.3d – , No. M2013-02189-SC-R11-CD, 2016 WL 2742841, at *7-8 (Tenn. May 10, 2016). For the following reasons, we agree with the State.

"A trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." State v. Williams, 185 S.W.3d 311, 314 (Tenn. 2006) (citing State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996)). However, this court's review of a trial court's application of the law to the facts is de novo. State v. Day, 263 S.W.3d 891, 900 (Tenn. 2008) (citing Williams, 185 S.W.3d at 315; State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997)). Because the pertinent facts in this case are not in dispute, our review is de novo – one of application of the law to the facts. State v. Williamson, 368 S.W.3d 468, 473 (Tenn. 2012).

Both the Fourth Amendment to the United States Constitution and article I, section 7 of the Tennessee Constitution protect citizens from unreasonable searches and seizures. See U.S. Const. amend. IV; Tenn. Const. art. 1, § 7. The purpose of these constitutional protections is to "'safeguard the privacy and security of individuals against arbitrary invasions of government officials.'" State v. Keith, 978 S.W.2d 861, 865 (Tenn. 1989) (quoting Camara v. Mun. Court, 387 U.S. 523, 528 (1967)). "The touchstone of the Fourth Amendment is reasonableness." Florida v. Jimeno, 500 U.S. 248, 250 (1991) (citing Katz v. United States, 389 U.S. 347, 360 (1967)). "[A] warrantless search or seizure is presumed unreasonable, and evidence discovered as a result thereof is subject to suppression unless the State demonstrates that the search or seizure was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement." Yeargan, 958 S.W.2d at 629 (citing Coolidge v. New Hampshire, 403 U.S. 403, 454-55 (1971)). Accordingly, the State bears the burden of establishing by a preponderance of the evidence that a warrantless search or seizure is constitutional. See, e.g., State v. Simpson, 968 S.W.2d 776, 780 (Tenn. 1998).

Not all police-citizen encounters implicate constitutional protections. See, e.g., State v. Nicholson, 188 S.W.3d 649, 656 (Tenn. 2006). The Tennessee Supreme Court has formerly recognized three tiers of interactions between law enforcement and private citizens: "(1) a full scale arrest which must be supported by probable cause; (2) a brief investigatory detention which must be supported by reasonable suspicion; and (3) brief police-citizen encounters which require no objective justification." State v. Daniel, 12 S.W.3d 420, 424 (Tenn. 2000) (citations omitted). Of these categories, "only the first two rise to the level of a 'seizure' for constitutional analysis purposes." Day, 263 S.W.3d at 901. "[W]hat begins as a consensual police-citizen encounter may mature into a seizure of the person." Daniel, 12 S.W.3d at 427. A seizure occurs "'when the Officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen.'" Day, 263 S.W.3d at 901-02 (quoting Terry v. Ohio, 392 U.S. 1, 19 n.16 (1968)). The relevant inquiry is "whether, 'in view of all of the circumstances surrounding the incident, a reasonable person would have believed he or she was not free to leave.'" State v. Randolph, 74 S.W.3d 330, 336 (Tenn. 2002) (quoting Daniel, 12 S.W.3d at 425).

In this case, at the conclusion of the suppression hearing, the trial court made the following oral findings of fact and conclusions of law:

> [L]et's talk about the actions of this officer in coming in contact with [Conkin] in this case. The officer was obviously responding to a call that had come into dispatch. It was 10 o'clock in the morning. The officer testified to the fact that it was cold. [After] speaking to someone there at the scene he went around to the side of this motel complex [and] saw the vehicle. [H]e parked his vehicle and there are [five] things he testified to about [Conkin's] vehicle: number one, the brake lights were on; number two, the reverse lights were on; number three, the windows were down . . . number four . . . the engine was on; and number five, it was very cold out . . . . [T]he officer testified that he didn't park behind the vehicle because, when somebody has their brake lights on you don't know what that vehicle is going to do . . . [That] seems to me to make sense and the officer has testified to that and I accredit the officer's testimony that he didn't park behind the vehicle, [or] in any way block the vehicle in.
>
> . . .
>
> Now let's go to the next point. [Officer Dunworth] goes up to the vehicle . . . in a public parking lot where you have a vehicle on, again, the windows down in the middle of the winter. This is January on a cold morning, two

-10-

people appear to be asleep and/or potentially passed out and the reverse lights are on[.] [S]o the officer certainly is, I think, concerned about that and . . . in my opinion his going up to the vehicle and having contact, again based on the testimony that I've heard is not anything different than a consensual conversation between two people in a public place. I think the officer had every right to, if he did touch her, to check to make sure, you know, she was okay. Again, we have a vehicle that's on and we have the vehicle that's in reverse. That's what the testimony has been, the vehicle is in reverse and the brake lights are on and this vehicle is in a − apparently behind the driver's seat is somebody that's either asleep or passed out so he certainly has, I think, every right to double check and see what's going on and, again, I've not heard anything to indicate in the testimony today that he did anything other than go up and have a consensual encounter with a person in a public parking lot. He didn't open the door. There was no reason to open the door because the window is down. He didn't have to do that, and that's what he testified to . . . So I find that it was consensual and based upon his consensual contact with this person . . . and then after she was aroused [and] having the conversation with her [he] made the determination that he needed to further investigate whether she was under the influence, got her out, [administered] field sobriety tests, [and] arrested her. So I don't find she was unlawfully seized in the way he parked or the way he went up and had his contact with her there at the scene before he was able to make the determination that she may be impaired and have to do further investigation. So I'm going to deny your motion with regard to that.

Importantly, the trial court announced its ruling prior to the release of State v. McCormick, − S.W.3d − , No. M2013-02189-SC-R11-CD, 2016 WL 2742841, at *7-8 (Tenn. May 10, 2016). Prior to McCormick, the community caretaking doctrine was limited to "consensual police-citizen encounters." Id. at *8. Under that standard, if a consensual encounter evolved into an investigatory stop or detention, the officer was required to have, at minimum, "a reasonable suspicion, supported by specific and articulable facts, that a criminal offense has been or is about to be committed." State v. Bridges, 963 S.W.2d 487, 492 (Tenn. 1992) (citing Terry, 392 U.S. at 21). Pursuant to McCormick, however, Tennessee now joins the majority of jurisdictions in recognizing that the "community caretaking doctrine is analytically distinct from consensual encounters and [may be] invoked to validate a search or seizure as reasonable under the Fourth Amendment and article I, section 7 of the Tennessee Constitution." McCormick, 2016 WL 2742841 at *8 (citations omitted). Accordingly, the community caretaking exception will justify a warrantless seizure if the State establishes that:

-11-

(1) the officer possessed specific and articulable facts which, viewed objectively and in the totality of the circumstances, reasonably warranted a conclusion that a community caretaking action was needed, such as the possibility of a person in need of assistance or the existence of a potential threat to public safety; and (2) the officer's behavior and the scope of the intrusion were reasonably restrained and tailored to the community caretaking need.

Id. at *9 (citations omitted). Additionally, the McCormick Court noted that determining the reasonableness of police action requires careful consideration into the facts and circumstances of each case, "including the nature and level of distress exhibited by the citizen, the location, the time of day, the accessibility and availability of assistance other than the officer, and the risk of danger if the officer provides no assistance." Id. (citations omitted).

In order to resolve this issue, it is significant to determine when the seizure occurred. In California v. Hodari D., 499 U.S. 621, 626, 111 S.Ct. 1547 (1991), the United States Supreme Court held that a seizure occurs for purposes of the Fourth Amendment only when an officer uses physical force to detain a person or where a person submits or yields to a show of authority by the officer. In so holding, the Supreme Court limited United States v. Mendenhall, 446 U.S. 544, 554, 100 S.Ct. 1870 (1980), which had held that a seizure occurs when a reasonable person, under the totality of the circumstances, would not feel free to leave. In McCormick, the Tennessee Supreme Court declined to revisit the standard of review for determining when a seizure occurred and recognized that it implicitly rejected the Hodari D. standard when it reaffirmed the Mendenhall standard in State v. Randolph, 74 S.W.3d 330, 337 (Tenn. 2002). McCormick, 2016 WL 2742841 at * 5.

Under either the Hodari D. or Mendenhall standard of review for determining when a seizure occurred, we conclude that Officer Dunworth seized Conkin when he reached into her vehicle and shook her. We further conclude that Officer Dunworth possessed specific and articulable facts which reasonably warranted a conclusion that he needed to check on Conkin. First, prior to arriving on the scene, Officer Dunworth had been informed that two people were either asleep or passed out in a running vehicle of a motel parking lot. Upon arrival, motel staff directed him to the vehicle and he observed that it was running, the windows were down, and it appeared to be in reverse. The fact that the windows were down was suspicious to Officer Dunworth because of the time of year and the weather. Based on these observations, it was reasonable to conclude that Conkin may have suffered some sort of medical emergency that caused her to fall asleep or pass out behind the wheel. It was also reasonable to conclude that the vehicle posed a safety threat to himself and the general public because the back-up lights were

illuminated, indicating that the vehicle was in gear. Moreover, Officer Dunworth testified that he only reached into the vehicle to shake Conkin after she failed to respond to his verbal commands. This testimony was accredited by the trial court. Accordingly, we conclude that Officer Dunworth's behavior was initially directed at making the vehicle safe and was therefore limited to a community caretaking purpose. It was only after he began speaking to Conkin that he observed signs of intoxication and began questioning her about her sobriety. For these reasons, Officer Dunworth's actions were justified under the community caretaking doctrine, and Conkin is not entitled to relief.

**III. Constitutionality of Tennessee DUI Statute.** Conkin also argues that Tennessee's DUI statute is unconstitutionally vague on its face because it fails to define the term "physical control." She claims that without such a definition, the statute fails to provide a defendant with adequate notice of what conduct is prohibited. The State responds that the phrase "physical control" has been rendered sufficiently definite to allow a person of ordinary understanding to apprehend its meaning.

When a defendant challenges the constitutionality of a statute, general principles of statutory construction apply, and appellate courts are charged with upholding the constitutionality of a statute whenever possible. State v. Lyons, 802 S.W.2d 590, 592 (Tenn. 1990). We must indulge every presumption and resolve every doubt in favor of constitutionality of the statute when reviewing a statute for a possible constitutional infirmity. Id. "The fair warning requirement embodied in the due process clause prohibits the states from holding an individual criminally responsible for conduct which he could not have reasonably understood to be proscribed." State v. Thomas, 635 S.W.2d 114, 116 (Tenn. 1982) (citing United States v. Harriss, 347 U.S. 612, 617 (1954)). Accordingly, "[i]f a statute is to avoid unconstitutional vagueness, it must 'define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement.'" Davis-Kidd Booksellers, Inc. v. McWherter, 866 S.W.2d 520, 532 (Tenn. 1993) (quoting Kolender v. Lawson, 461 U.S. 352, 358 (1983)). "The key question for constitutional vagueness purposes is whether the statute at issue gives persons of ordinary intelligence fair notice as to what conduct is prohibited by the statute." State v. Jonathan Wade Rosson, No. M2010-01361-CCA-R3-CD, 2012 WL 1813107, at *15 (Tenn. Crim. App. May 18, 2012) (citing Papachristou v. Jacksonville, 405 U.S. 156, 162 (1972)), perm. app denied (Tenn. Oct. 5, 2012).

Nevertheless, the Tennessee Supreme Court has noted that the fair warning requirement "does not demand absolute precision in the drafting of criminal statutes." State v. Burkhart, 58 S.W.3d 694, 697 (Tenn. 2001). "The constitutional test for vagueness is whether a statute's 'prohibitions are not clearly defined and are susceptible to different interpretations as to what conduct is actually proscribed.'" State v. Pickett,

211 S.W.3d 696, 704 (Tenn. 2007) (citing State v. Forbes, 918 S.W.2d 431, 447-48 (Tenn. Crim. App. 1995)). Accordingly, a statute is not unconstitutionally vague if "by orderly process of litigation [it] can be rendered sufficiently definite and certain for purposes of judicial decision." Id. (citing State v. Wilkins, 655 S.W.2d 914, 916 (Tenn. 1983)).

Preliminarily, we note that there is no indication that Conkin filed a pre-trial motion challenging the constitutionality of Tennessee Code Annotated section 55-10-401. According to the record, Conkin raised the issue for the first time in her motion for new trial. This court has previously held that pursuant to Tenn. R. Crim. P. 12(b)(2), "'defenses and objections based on defects in the indictment,' including challenges to the constitutionality of an underlying criminal statute, must be raised prior to trial in order to avoid waiver of the issue." State v. Smith, 48 S.W.3d 159, 162 n. 1 (Tenn. Crim. App. 2000) (quoting State v. Seagraves, 837 S.W.2d 615, 623 (Tenn. Crim. App. 1992)); State v. Farmer, 675 S.W.2d 212, 214 (Tenn. Crim. App. 1984). However, we also note that the State does not argue waiver on appeal. Accordingly, we will address the merits of Conkin's argument.

The Tennessee DUI statute does not define "physical control," however, the Tennessee Supreme Court has twice addressed the meaning of the phrase in the context of a DUI case. As previously noted, in Lawrence, the Tennessee Supreme Court established a totality of the circumstances test for determining whether the accused's activity is sufficient to constitute physical control of a vehicle. The Lawrence Court specified five factors for courts to consider closely, including: (1) the location of the defendant, (2) the location of the keys, (3) whether the motor was running, (4) whether the defendant had the ability to direct the use of the vehicle, and (5) the extent to which the vehicle is capable of being operated. 849 S.W.2d at 765. Moreover, in Butler the Court expounded on the fifth factor and adopted the "reasonably capable of being rendered operable" standard to aid the trier of fact in "distinguish[ing] a car that runs out of gas on a major freeway near several exits and gas stations from a car with a cracked block which renders it 'totally inoperable.'" Butler, 108 S.W.3d at 852 (quoting Smelter, 674 P.2d at 693).

We conclude that the statute is sufficiently definite to put Conkin on notice that falling asleep in the driver's seat of a running vehicle while intoxicated could subject her to prosecution for DUI by physical control. Moreover, we hold that the tests enunciated in Lawrence and Butler provide adequate guidance for consistent appellate review of whether a defendant has "physical control" over a vehicle in the context of a prosecution for DUI. As such, the statute is not unconstitutionally vague, and Conkin is not entitled to relief on this issue.

**IV. Brady Violations.** Conkin argues that the State's failure to disclose their discovery of exculpatory text messages which she claims "corroborated [her] version of events – namely that she had spent the majority of the early morning texting and calling an attempt to locate her friend." The State responds that Conkin has failed to show a Brady violation because the text messages were neither suppressed by the State nor material to the defense. We agree with the State.

The Due Process Clause of the Fourteenth Amendment to the United States Constitution and the "Law of the Land" Clause of Article I, section 8 of the Tennessee Constitution afford all criminal defendants the right to a fair trial. The United States Supreme Court in Brady v. Maryland, 373 U.S. 83, 87 (1963), held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of good faith or bad faith of the prosecution." Evidence that is "favorable to an accused" includes both "evidence deemed to be exculpatory in nature and evidence that could be used to impeach the state's witnesses." Johnson v. State, 38 S.W.3d 52, 55-56 (Tenn. 2001). Favorable evidence has also been defined as the following:

> [E]vidence which provides some significant aid to the defendant's case, whether it furnishes corroboration of the defendant's story, calls into question a material, although not indispensable, element of the prosecution's version of the events, or challenges the credibility of a key prosecution witness.

Id. at 56-57 (quoting Commonwealth v. Ellison, 379 N.E.2d 560, 571 (Mass. 1978)). "The duty to disclose exculpatory evidence extends to all 'favorable information' irrespective of whether the evidence is admissible at trial." State v. Robinson, 146 S.W.3d 469, 512 (Tenn. 2004) (citing Johnson, 38 S.W.3d at 56).

In order to establish a Brady violation, the defendant must show the existence of four elements: (1) that the defendant requested the information (unless the evidence is obviously exculpatory, in which case the State is bound to release the information whether requested or not); (2) that the State withheld the information; (3) that the withheld information was favorable; and (4) that the withheld information was material. State v. Edgin, 902 S.W.2d 387, 389 (Tenn. 1995) (citations omitted). Evidence is considered material under this standard only "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Kyles v. Whitley, 514 U.S. 419, 433 (1995) (citation omitted); Edgin, 902 S.W.2d at 390. The United States Supreme Court held:

> [The] touchstone of materiality is a "reasonable probability" of a different

result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial."

Kyles, 514 U.S. at 434 (quoting United States v. Bagley, 473 U.S. 667, 678 (1985)). Both impeachment evidence and exculpatory evidence fall within the Brady rule. Bagley, 473 U.S. at 676. The burden of proving a Brady violation rests with the defendant, and the violation must be proved by a preponderance of the evidence. Edgin, 902 S.W.2d at 389 (citing State v. Spurlock, 874 S.W.2d 602, 610 (Tenn. Crim. App. 1993)).

At the hearing on the motion for a new trial, the trial court explained its basis for denying relief as follows:

[D]uring the cross examination [of Conkin] the State did not ask any questions with regard to attempting to impugn her credibility with regard to why she was out in the vehicle or the fact that she was out there to text or make phone calls looking for her friend. In fact, in the State's proof Officer Dunworth stated . . . that [he] asked her why she was in the vehicle and she said she was looking for another female [and was] unable to get ahold of [her] and she spent the majority of the evening texting and calling so basically he corroborated her story, Officer Dunworth did in direct exam. I think if the State had asked questions to attack her credibility based on the texting and calling and the cell service we'd have a whole different story but I think at the posture we're in that I'm going to deny that ground as well[.]

Upon review, we agree with the trial court's determination that Conkin failed to prove the elements required to establish a Brady violation. Most notably, Conkin failed to show that the evidence was material because her claim that she was in the vehicle trying to reach a missing friend went unchallenged at trial. Accordingly, it is unlikely that evidence bolstering this claim would have affected the outcome. Moreover, the offense of DUI by physical control is a strict liability crime in Tennessee. See Turner, 953 S.W. 2d at 215. As such, evidence of Conkin's intent is not relevant to the question of whether she was in physical control of the vehicle while intoxicated. See State v. Robert G. Laney, No. M2005-00502-CCA-R3-CD, 2005 WL 3199050, at *3 (Tenn. Crim. App. Nov. 30, 2005) (holding that where the facts support a finding that the

-16-

defendant physically controlled a vehicle, "It is immaterial that the defendant did not drive the vehicle . . . or that he had no intention of driving away."); State v. Steven Fredrick Brinkley, No. M2003-02419-CCA-R3-CD, 2004 WL 2964706, at *6 (Tenn. Crim. App. Dec. 22, 2004), perm. app. denied (Tenn. May 9, 2005) ("The Defendant's assertions that he was using his vehicle as a shelter, while corroborated, are not relevant to the analysis of whether he was in physical control of his vehicle for purposes of the DUI statute."); State v. James W. Starnes, No. 01C01-9408-CC-00279, 1995 WL 415230, at *2-3 (Tenn. Crim. App., at Nashville, July 14, 1995), perm. app. denied (Tenn. Jan 8, 1996) (holding that the issue of whether the defendant attempted to start his vehicle was irrelevant where it was shown that defendant was in the driver's seat, intoxicated, and vehicle was mechanically capable of being driven).

Finally, the text messages at issue were sent from Conkin's phone, purportedly by Conkin herself. As this court has stated, "when exculpatory evidence is equally available to the prosecution and the accused, the accused 'must bear the responsibility of [her] failure to seek its discovery.'" State v. Colvett, 481 S.W.3d 172, 201 (Tenn. Crim. App. 2014) (citing State v. Marshall, 845 S.W.2d 228, 233 (Tenn. Crim. App. 1992)). In this case, the text messages were equally available to Conkin because she had actual knowledge of sending the text messages and could have procured them if she determined that they were material to her defense. For these reasons, Conkin is not entitled to relief on this issue.

## CONCLUSION

Discerning no error, we affirm the judgment of the trial court.

_____
CAMILLE R. McMULLEN, JUDGE